UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

St. Croix Printing Equipment, Inc.,                    Civil No. 06-4273 (PAM/JSM)

            Plaintiff,

v.                                                     **MEMORANDUM AND ORDER**

Debbie Sexton, St. Croix Printing
Equipment Imports, Ltd.,
Shinohara USA, Inc., and
Shinsuke Kubota,

            Defendants.

---

This matter is before the Court on Defendants' Motions for Summary Judgment. For the reasons that follow, the Court grants the Motions.

**BACKGROUND**

The facts of the matter are fully set forth in this Court's Order of May 29, 2008.[1] In brief, Plaintiff St. Croix Printing Equipment, Inc. ("St. Croix Minnesota"), located in Stillwater, Minnesota, sells used printing presses. St. Croix Minnesota is owned by John Diana ("Diana"). More than 20 years ago, Diana and Defendant Debbie Sexton together owned a company also called St. Croix Printing Equipment, Inc. In 1989, Sexton opened her own business, called St. Croix Printing Equipment Imports, Ltd. ("St. Croix Iowa"), located

---

[1] In that Order, the Court granted summary judgment to Plaintiff on Defendant Shinohara USA's Counterclaims, which alleged violations of the Lanham Act, 15 U.S.C. §§ 1114 et seq., unfair competition in violation of Minnesota common law, and deceptive trade practices in violation of the Minnesota Deceptive Trade Practices Act ("DTPA"), Minn. Stat. §§ 325D.43 et seq.

in Iowa.

St. Croix Iowa is an authorized dealer for printing presses manufactured by the Japanese parent company of Defendant Shinohara USA, Inc. ("Shinohara"). St. Croix Minnesota sells used Shinohara printing presses, among other brands, but is not an authorized Shinohara dealer.

St. Croix Minnesota's claims arise out of Defendants' alleged conduct with respect to two of St. Croix Minnesota's customers: John Schuster ("Schuster") and Tandem Printing ("Tandem"). St. Croix Minnesota contends that Defendants told Schuster false and misleading things about the used press he had contracted to buy from St. Croix Minnesota, causing Schuster to breach his contract with St. Croix Minnesota and instead to purchase a new Shinohara press from St. Croix Iowa. St. Croix Minnesota further alleges that Sexton and St. Croix Iowa charged Tandem an exorbitant fee for post-installation work that was required on the press Tandem purchased from St. Croix Minnesota, causing Tandem to withhold the amount of the fee from its final payment to St. Croix Minnesota.

**A.     Schuster**

In early 2006, an authorized Shinohara dealer named Ken Williams contacted Diana about a used Shinohara press that was available for sale. Diana then contacted Schuster, who ultimately decided to buy the press. Several days later, Sexton visited Schuster and learned that he was buying a press from St. Croix Minnesota. Schuster gave Sexton the serial number of the press he had agreed to purchase.

According to Defendants, Sexton contacted Shinohara USA about the press and

learned that it had been damaged while being delivered to another customer. Defendants contend that the press was unsalable and unusable. In fact, Defendants sued the delivery company alleging that the press was essentially destroyed. In that lawsuit, Ken Williams testified that the press could not be repaired and should not be sold. Defendants contend that St. Croix Minnesota was attempting to pass off this unusable press to Schuster, who was not told that the press was damaged in any way.

St. Croix Minnesota contends that Defendants seriously overstate the extent of the damage to the press. In fact, after Schuster decided not to buy the supposedly unusable press, the press was sold to another printing company that has been using it without incident. St. Croix Minnesota argues that Defendants' interference with the Schuster sale amounts to tortious interference and violations of the Deceptive Trade Practices Act, because Defendants knew that the press was in working condition but told Schuster that it was not. Further, St. Croix Minnesota alleges that Defendants implied to Schuster that Diana was lying to him about the condition of the press, thus defaming St. Croix Minnesota.

**B.   Tandem**

In 2001, Tandem purchased a used Shinohara press from St. Croix Minnesota. St. Croix Minnesota had imported this press from Japan and thus the operating language for the press was Japanese. St. Croix Minnesota attempted to reprogram the press to English but was unable to do so. Tandem then sought the help of Sexton and St. Croix Iowa. Sexton and her technicians ultimately fixed the issue and charged Tandem more than $36,000 for St. Croix Iowa's services. Tandem withheld this amount from its final payment to St. Croix

Minnesota.

Defendants contend that the reprogramming was complicated and required many hours of work. St. Croix Minnesota argues that Sexton charged Tandem $36,000 for $1,500 worth of parts because she knew that Tandem would withhold the amount from its final payment to St. Croix Minnesota, thereby depriving St. Croix Minnesota of its profit in the transaction.

**C.      Plaintiff's Claims**

In its Amended Complaint, St. Croix Minnesota raises the following claims: tortious interference with the Schuster contract (Count I), tortious interference with the Tandem contract (Count II), defamation arising out of the Schuster transaction (Count III), violations of the Minnesota DTPA arising out of the Schuster transaction (Count IV), tortious interference with the prospective advantage of the Schuster sale (Count V), and "vicarious liability," seeking to hold the corporate Defendants liable for the actions of the individual Defendants (Counts VI and VII).

Defendants seek summary judgment on these claims, contending that there are no genuine issues of fact on the elements of St. Croix Minnesota's causes of action and that Defendants are entitled to judgment as a matter of law.

**DISCUSSION**

**A.     Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**B.     Tortious Interference**

Under Minnesota law, a plaintiff seeking to establish a claim for tortious interference with contract must show: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach." Bebo v. Delander, 632 N.W.2d 732, 738 (Minn. Ct.

App. 2001) (quoting Furlev Sales & Assocs., Inc. v. North Am. Auto. Warehouse, 325 N.W.2d 20, 25 (Minn.1982)).  Similarly, a claim for tortious interference with prospective business advantage requires a plaintiff to prove:

1. the existence of a reasonable expectation of economic advantage or benefit belonging to Plaintiff;

2. that Defendants had knowledge of that expectation of economic advantage;

3. that Defendants wrongfully and without justification interfered with Plaintiff's reasonable expectation of economic advantage or benefit;

4. that in the absence of the wrongful act of Defendants, it is reasonably probable that Plaintiff would have realized his economic advantage or benefit; and

5. that Plaintiff sustained damages as a result of this activity.

Harbor Broad., Inc. v. Boundary Waters Broad'rs, Inc., 636 N.W.2d 560, 569 (Minn. Ct. App. 2001) (quoting Lamminen v. City of Cloquet, 987 F. Supp. 723, 731 (D. Minn. 1997) (Davis, J.)).[2]  An important element of both torts is causation—that but for Defendants' alleged interference, St. Croix Minnesota would have secured the business or obtained the business advantage.  Rainforest Café, Inc. v. Amazon, Inc., 86 F. Supp. 2d 886, 909 (D. Minn. 2001) (Davis, J.) (citing N. Cent. Co. v. Phelps Aero, Inc., 139 N.W.2d 258, 263 (Minn. 1965)).

---

[2] There is some question as to whether Minnesota recognizes the tort of interference with prospective advantage.  Benefit Resource, Inc. v. Apprize Tech. Solutions, Inc., Civ. No. 07-4199, 2008 WL 2080977, at *10 n.6 (D. Minn. May 15, 2008) (Ericksen, J.) (citing Harbor Broad., 636 N.W.2d at 569 n.4)

**1.     Schuster**

Because a claim for tortious interference may lie only when the alleged interference is wrongful, St. Croix Minnesota's claims depend only on whatever false information Sexton allegedly supplied to Schuster. St. Croix Minnesota bases its tortious interference claim on the following allegedly false statements:

> the printing press was a 2001 model year, not a 2003 model year; the printing press was a model 74, not a model 75; the subject printing press was "dropped and the frame broken at both ends" and defective; the press was owned by Shinohara; and the press being offered was a prototype.

(Am. Compl. ¶ 12.)[3]

The evidence in the record shows that Schuster did not decide to cancel his contract with St. Croix Minnesota because of any alleged misrepresentations regarding the model year, model number, or ownership of the press. Nor did he cancel the transaction because Sexton told him that the press was a prototype. Indeed, the misstatements about the model number and year, ownership, and whether the press was a prototype were corrected within a short time after Sexton made them and had no effect on Schuster's decision to cancel the transaction. (Veith Decl. Ex. G (Schuster Dep.) at 27 ("Within days we realized that most

---

[3] Although Defendants do not raise the issue, it is questionable whether St. Croix Minnesota can claim both tortious interference and defamation arising out of the same allegedly false statements. See Dunham v. Opperman, No. A06-750, 2007 WL 1191599, at *6-*7 (Minn. Ct. App. Apr. 24, 2007), rev. denied July 17, 2007 (finding that where same statements form the basis of claim for tortious interference and defamation, defamation claim encompasses tortious interference claim and tortious interference claim was properly dismissed). Here, St. Croix Minnesota cites the same allegedly false statements to support both its tortious interference and defamation claims. (Am. Compl. ¶¶ 12, 33.)

of what we were told [by St. Croix Minnesota] about the press was accurate, other than the omission about the damage.").)

The record also reflects that although Sexton told Schuster that the press was cracked and damaged, she did not tell him that the press was defective and would not work. (Bruozas Decl. Ex. GG (Schuster Dep.) at 41 ("I was not told by anyone that the press would not work.").) St. Croix Minnesota cannot claim that Schuster rescinded the contract because of misinformation about whether the press would work.

Thus, the only statement that could form the basis for St. Croix Minnesota's tortious interference claim is Sexton's statement that the press was damaged. It is undisputed that the press St. Croix Minnesota attempted to sell to Schuster was cracked. There is much dispute about how the damage affected the press and about the extent of the damage. However, whether the press was indeed cracked on both ends or on only one end is immaterial. The press was cracked, and Diana did not disclose this information to Schuster. (Id.) The record is unequivocal that Diana's failure to disclose the damage, and not Sexton's alleged misstatement about the extent of the damage, was fatal to the Schuster transaction,. (Id. ("At that point, I wasn't going to buy anything from [St. Croix Minnesota] because I was misled . . . .").)

St. Croix Minnesota has failed to show causation with respect to its claims for tortious interference arising out of the Schuster transaction. In other words, St. Croix Minnesota has not established that, but for Sexton's misstatement that the press was damaged on both ends, Schuster would have proceeded with the sale. Defendants' Motion is granted as to Counts

8

I and V.

**2.   Tandem**

As noted above, one element of tortious interference with contract is that the alleged interference result in the breach of the contract.  St. Croix Minnesota has failed to establish that genuine issues of fact exist as to whether Tandem breached its contract with St. Croix Minnesota, and thus its claim for tortious interference fails.[4]

The purchase agreement between Tandem and St. Croix Minnesota provides that Tandem was entitled to a refund if the press did not perform to Tandem's standards.  (Diana Decl. Ex. 6 at 1.)  There is no dispute that St. Croix Minnesota was not able to install the press so that it performed satisfactorily, because St. Croix Minnesota was unable to change the press's language from Japanese to English.  Thus, Tandem was entitled to, and did, withhold some of the agreed-on purchase price.

Moreover, at the hearing on these Motions St. Croix Minnesota contended that the original purchase agreement was superseded by a settlement agreement.  (Id. Ex. 9.)  This settlement agreement specifically allowed Tandem to withhold money from the purchase price to pay St. Croix Iowa's fees for the language conversion.  (Id. at 1 ("The remaining

---

[4]   St. Croix Minnesota has also failed to establish that the amount Sexton charged Tandem for the language conversion was unreasonable.  The only testimony in the record is that the language conversion was complicated and that Sexton and her technicians spent "a tremendous amount of time" on the conversion.  (Veith Decl. Ex. E (Sexton Dep.) at 97.)  St. Croix Minnesota has not come forward with anything to rebut Sexton's statements, such as expert testimony that the Tandem conversion should have cost much less than what Sexton charged.

balanced owed to [St. Croix Minnesota] . . . shall be retained by [Tandem] and used to pay [St. Croix Iowa] for the language conversion.").) If, as St. Croix Minnesota stated, this settlement agreement is the operative contract, there can be no contention that Tandem breached any contract. St. Croix Minnesota has no claim for tortious interference arising out of the Tandem transaction, and Defendants' Motion as to Count II is granted.

**C.     Defamation**

St. Croix Minnesota contends that the following statements Sexton made to Schuster were false and defamatory:

> the printing press was a 2001 model year, not a 2003 model year; the printing press was a model 74, not a model 75; the subject printing press was "dropped and the frame broken at both ends" and defective; the press was owned by Shinohara; and the press being offered was a prototype.

(Am. Comp. ¶ 33.) These statements are alleged to be defamatory not on their face, but in what they imply about St. Croix Minnesota, namely, that St. Croix Minnesota misled Schuster.

To state a claim for defamation under Minnesota law St. Croix Minnesota must prove that the alleged statements were made, communicated to a third person, false, and harmed St. Croix Minnesota's reputation. See Thompson v. Olsten Kimberly Qualitycare, Inc., 33 F. Supp.2d 806, 815 (D. Minn. 1999) (Tunheim, J.) (citing Ferrell v. Cross, 557 N.W.2d 560, 565 (Minn. 1997)).

In addition, Minnesota considers corporations to be public figures and therefore requires a showing that the statements were made with actual malice. Northwest Airlines,

Inc. v. Aestrea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997) (citing Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476, 487 (Minn. 1985)). "Actual malice" means that the alleged defamer acted "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." Chafoulias v. Peterson, 668 N.W.2d 643, 654 (Minn. 2003) (quoting New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964)). Actual malice "does not mean that the defendant acted with ill will or spite." Id. (citing Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 665-67, 666 n.7 (1989)). Reckless disregard requires proof that the defendant made "the statement while subjectively believing that the statement was probably false." Id. at 655. The United States Supreme Court has explained that a statement is made with actual malice if it "is fabricated by the defendant, is a product of his imagination, . . . is based wholly on an anonymous unverified telephone call[, or if] the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." St. Amant v. Thomson, 390 U.S. 727, 732 (1968).

Here, the evidence shows that Sexton corrected within a very short time the misinformation she gave Schuster about the press's model number, model year, ownership, and whether it was a prototype. There is no evidence in the record that Sexton acted with actual malice in making these statements, and indeed the fact that she returned to Schuster's office the next day to correct the misinformation belies any claim that she or any of the Defendants acted with actual malice as to those statements.

With respect to the remaining statements, that the press was broken at both ends and

11

was defective, there is no evidence in the record that Sexton or any of the Defendants made these statements. As noted above, Schuster testified that "I was not told by anyone that the press would not work." (Bruozas Decl. Ex. GG (Schuster Dep.) at 41.) Schuster's belief as to the working condition of the press came not from Sexton or other Defendants, but from the fact that St. Croix Minnesota did not disclose that the press was damaged. (Id. (stating that after Diana told Schuster that he was buying the press "as is," Schuster decided "I wasn't going to buy anything from [St. Croix Minnesota] because I was misled and I am not going to invest $400,000 on something that might or might not work.").) St. Croix Minnesota cannot hold Defendants responsible for a lost sale caused by St. Croix Minnesota's failure to be honest with a customer. The defamation claims fail.

### D.    Deceptive Trade Practices

The Minnesota DTPA defines a deceptive trade practice as, among other things, "disparag[ing] the goods, services, or business of another by false or misleading representation of fact." Minn. Stat. § 325D.44, subd. 1(8). St. Croix Minnesota contends that Defendants violated Minnesota's DTPA by "disparaging the goods, services, or business of" St. Croix Minnesota. (Am. Compl. ¶ 38.) The statements they cite as the basis for this claim are the same statements cited with respect to the tortious interference and defamation claims. (Id. ¶ 39.) Because the Court has found that the statements were either corrected very shortly after they were made or were not made, St. Croix Minnesota cannot recover for business disparagement under the DTPA. See MSK EyEs Ltd. v. Wells Fargo Bank, Civ. No. 05-999, 2007 WL 1965549, at *8 (D. Minn. Jul. 3, 2007) (Doty, J.) (dismissing DTPA

business disparagement claim when defamation claim based on same statements also dismissed).

### E.	Vicarious Liability

St. Croix Minnesota seeks to hold the corporate Defendants liable for the actions of the individual Defendants. However, because St. Croix Minnesota has no viable claims against any Defendants, its claims for vicarious liability also fail.

## CONCLUSION

St. Croix Minnesota has failed to show that any genuine issues of material fact exist on its claims. Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment (Docket Nos. 103, 116) are **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   August 7, 2008

*s/Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge